NOTICE
Decision filed 04/16/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220772-U

NO. 5-22-0772

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MICHAEL KNIGHT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 19-D-429 |
| | ) | |
| RAQUEL KNIGHT, | ) | Honorable James R. Coryell, |
| | ) | Honorable Phoebe S. Bowers, |
| Respondent-Appellant. | ) | Judges, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse and remand the October 25, 2022, and July 18, 2023, orders of the circuit court of Macon County where the court erred in its allocation of parental responsibilities by failing to analyze the relevant statutory factors in determining the children's best interests.

¶ 2    The respondent, Raquel Knight, appeals the October 25, 2022, and July 18, 2023, orders of the circuit court of Macon County allocating the petitioner, Michael Knight, sole parental decision-making responsibilities for education, medical, and extracurricular activities along with the majority of parenting time. On appeal, Raquel argues that the trial court abused its discretion when it dismissed her petition to allow travel, and further erred by not ruling on the issues of (1) family counseling by and between the children and Raquel, (2) electronic communication between the children and Raquel, (3) emergency contact with the schools by Raquel, and

1

(4) communication with the daycare providers by Raquel. Further, Raquel argues that the court's allocation of decision-making authority and parenting time was against the manifest weight of the evidence and an abuse of discretion. For the reasons that follow, we reverse and remand.

¶ 3                                                    I. BACKGROUND

¶ 4        Michael and Raquel married on January 18, 2008, in Decatur, Illinois. They share three biological children, C.K., born August 10, 2007, R.K., born May 1, 2009, and J.K., born January 14, 2016. On September 26, 2019, Michael filed an order of protection against Raquel based upon "erratic and alarming" behavior, which resulted in a settlement agreement between the parties. The settlement agreement restricted contact between the parties and further placed restrictions on Raquel regarding the children.

¶ 5        The Illinois Department of Children and Family Services (DCFS) became involved with the family due to allegations of domestic violence and environmental and housing neglect. During its investigation, DCFS discovered that the children were not provided with adequate homeschooling instruction. Additionally, DCFS had serious concerns about the condition of the home itself. During its investigation, Raquel admitted to using a rod to hit the children as a form of discipline. DCFS enacted a safety plan wherein the children were placed in the protective custody of their maternal grandmother, Ruth Burns, until the house was rendered habitable. Michael remedied the condition of the house, and the children were returned to his sole custody. DCFS indicated Raquel for allowing an injurious environment. Raquel was removed from the home and a visitation plan was developed. DCFS opened an intact case in which temporary supervised visits were instituted for Raquel, and she was required to submit to a mental examination.

¶ 6    On December 12, 2019, Michael filed a verified petition for dissolution of marriage. On January 30, 2020, Raquel filed an answer to the petition for dissolution as well as a petition for temporary relief. Her petition for temporary relief requested, *inter alia*, that the trial court allocate her the majority of parenting time and that Michael be ordered to pay temporary maintenance, temporary child support, and interim attorney fees. On February 7, 2020, Michael filed his response to the petition for temporary relief and a counter petition for temporary relief seeking child support from Raquel and asked the court to impute her income. On March 28, 2020, Raquel filed a motion to compel mental examination of Michael.

¶ 7    On March 2, 2020, Michael filed a petition for restricted parenting time and appointment of a guardian *ad litem* (GAL). Michael's petition alleged that Raquel was experiencing severe mental health issues that gave rise to safety concerns if the children were left in her care unsupervised. The petition noted DCFS's involvement in 2019 and alleged Youth Advocate was handling the case through intact services. The petition stated that Youth Advocate imposed supervised visits on Raquel because of her mental health issues. Michael's petition requested that the court enter an order requiring Raquel's parenting time restricted with supervision, that the court require Raquel to undergo a psychological evaluation, and that the court appoint a GAL for the children.

¶ 8    On March 3, 2020, a hearing was held on all pending motions. The parties submitted a mediation agreement for temporary parenting time which was approved by the court. The mediation agreement stated the parties agreed, *inter alia*, (1) to follow the recommendations and conditions currently imposed by DCFS or Youth Advocate as to Raquel's supervised parenting time; (2) Michael's petition for restricted parenting time be suspended on a temporary basis and called for hearing if and when restrictions by DCFS or Youth Advocate are lifted; (3) if DCFS or

3

Youth Advocate lifted such restrictions, the children's maternal grandmother could act as a supervisor for Raquel's visits; (4) Raquel agreed to continue with all recommended mental health treatment; and (5) Michael agreed that the two older children receive six therapy sessions as approved by his insurance and that he would seek a responsible counselor for the younger child.

¶ 9     On May 21, 2020, Michael filed a second petition for temporary relief seeking child support and monetary contributions for school, daycare, and medical expenses. On July 21, 2020, Raquel filed a response to Michael's second petition for temporary relief requesting that the court deny Michael's petition. On August 4, 2020, Raquel filed a petition for deviation of child support requesting a downward deviation from the support obligations due to her financial position.

¶ 10     On September 1, 2020, an agreed order on temporary parenting time was entered wherein Raquel's temporary parenting time was modified to every Sunday from 9:30 a.m. to 11:30 a.m. and every Wednesday from 6 p.m. to 8 p.m.

¶ 11     On January 21, 2021, the GAL filed her final report and recommendation, wherein she recommended to the trial court that Michael be awarded significant decision-making responsibilities for medical, education, and extracurricular activities and that neither parent be allocated significant decision-making responsibilities for religion. The GAL further recommended that Michael be awarded the majority of parenting time and that Raquel's parenting time be gradually increased after Raquel and the children attend at least two family counseling sessions.

¶ 12     On July 22, 2021, Raquel filed a petition for family counseling and modification of parenting time *instanter*. Raquel's petition requested that the trial court order the minor children to attend family counseling as set forth in the GAL's report, that Michael be ordered to pay 75% of family counseling expenses not covered by his insurance, and that the court enter an order awarding transitional and increased parenting time for Raquel.

4

¶ 13    On April 11, 2022, an agreed order was entered wherein the GAL was instructed to interview the parties and the parties' three children. The GAL was also to interview Debbie Cox-Schwalbe from Pleasant Counseling and complete a supplemental GAL report if deemed appropriate. On April 26, 2022, the GAL filed her supplemental report and recommendation. The GAL's supplemental report revised her initial report and recommended, *inter alia*, that the eldest child, C.K., only exercise voluntary parenting time with Raquel. The supplemental report also recommended that at least two sessions of family counseling take place between Raquel and C.K. and R.K. before Raquel received any increase in parenting time with them. Lastly, the supplemental report recommended that R.K. and J.K. should transition to equal parenting time with the parties by the time school was to start in the fall of 2022.

¶ 14    The trial on all pending issues commenced April 27, 2022, and continued on August 19, 2022. At trial, Michael first called Trisha Morehead, an intact case aide worker at Webster-Cantrell Youth Advocacy, as a witness. Morehead testified that she first became familiar with the parties when an intact case was opened in October 2019. Morehead testified that she conducted supervised visits twice a week with Raquel and the children from February 2020 through August 2020 when the intact case was closed. Further, Morehead testified that Raquel "did okay" during the visits, brought appropriate snacks, and only had to redirect Raquel when she spoke to the kids about certain things like their clothes or specific questions regarding school and bus stops. Morehead testified that Raquel, because of her religion, preferred R.K. to be dressed in dresses instead of shorts.

¶ 15    Morehead testified that she allowed the children to speak to Raquel's mother, Ruth, via telephone during the visits. Further, Morehead testified that she visited Raquel's home near the end of the case, and the home was clean with appropriate beds for the kids. Morehead could not

5

answer whether she had any concerns with Raquel having extended time with the children due to the length of time since the last visit.

¶ 16    On cross-examination, Morehead testified that during the visits, Raquel took the children to the library, the park, restaurants, and "visits all over." Further, she testified the moods of the children were "okay" and the children mentioned a few times that they felt more comfortable with the visits being supervised. Morehead testified that C.K. became upset when he learned the intact case was closed, because he thought that meant the visits with Raquel would end. Morehead testified that J.K. did great during the visits and was "all over his momma." She also testified that R.K.'s mood was "good" during the visits.

¶ 17    Michael next called Leandra Tate, an investigator for child protection at DCFS in Decatur. Tate testified that she first became familiar with the parties when she was assigned their investigation. Tate testified that her biggest concern was Raquel's mental health. Tate testified she spoke with the schools that the children used to attend and was informed that Raquel demanded to sit with the children in their classes every day. When denied, Raquel pulled the kids out of school. Tate testified that Raquel stated the children were being homeschooled, but all of the materials were underneath a large pile of debris in the living room. Further, Tate testified that another concern was the condition of the home itself. She testified that the home was in disarray and not a safe environment for the children.

¶ 18    Tate testified that the children told her when Michael attempted to clean the home, Raquel would yell at him and "throw a fit." Tate opined that Raquel had a hoarding issue and the bedrooms were so bad that the kids could only sleep on the couch or the floor in front of the couch. Tate also testified that the children told her Michael would bring home food for them to eat, but Raquel would not let them eat it because she thought Michael was poisoning them. Tate testified that in

6

her interviews with Raquel, she would bring up Michael's "horrible addiction" which turned out to be his smoking of cigarettes. Tate testified Michael did not smoke in the house but Raquel "made [a] very big deal" about his smoking. Tate testified that once Raquel was removed from the house under the intact plan, Michael cleaned and repaired the house so that the kids could return and that he enrolled them in school. Tate testified that Raquel was indicated for an injurious environment.

¶ 19    Further, Tate testified that during her investigation, Raquel initially alleged that Michael was physically abusing her but eventually admitted there was no physical abuse. Additionally, Tate also testified there was an "unfounded investigation" into Michael for possession of child pornography.

¶ 20    Michael next called Debbie Cox-Schwalbe as a witness. Schwalbe testified that she was a licensed clinical professional counselor with 20 years' experience and worked in private counseling with Pleasant Counseling in Decatur. Schwalbe testified she first met C.K. and R.K. in June of 2020 when Michael enrolled them in counseling. She testified that she prepared Petitioner's Exhibit 1, which was a report created after her initial meeting with C.K. and R.K. The report recommended that Raquel have limited visitation with the children, because the children were under distress because of Raquel's expectations of the children.

¶ 21    Schwalbe testified that she met with either C.K. or R.K. every week, alternating between the children. She testified that the children adjusted well to living with Michael, and she did not believe that the children had been coached before their therapy sessions. Further, Schwalbe opined that Michael should have primary parenting time and believed that Raquel having only four hours of parenting time a week was in the children's best interest. Schwalbe testified that C.K. reported that he would prefer not to visit Raquel. Schwalbe also testified that C.K. disclosed that Raquel inflicted corporal punishment on the children.

7

¶ 22    Schwalbe testified as to the accuracy of a counseling report dated March 16, 2022. In that counseling report, Schwalbe recommended that the children have limited visitation with Raquel based on what the children had shared in their counseling sessions. Schwalbe further opined that overnight visits with Raquel would not be appropriate unless she started showing more attention to C.K. and R.K.

¶ 23    On cross-examination, Schwalbe testified that she had 10 individual sessions with R.K. and 10 individual sessions with C.K., all of which occurred in 2020. Schwalbe had two sessions, one in 2020 and one in March of 2022, with both R.K. and C.K. Schwalbe testified that on occasion, the conferences would include Michael, or oftentimes, she would meet with Michael before the conferences and ask his opinion on how the children were doing. Prior to the March 15, 2022, session, Schwalbe had not seen the children since December of 2020. Schwalbe testified that she never interviewed Raquel, nor did she observe Raquel interact with the children.

¶ 24    On cross-examination, Schwalbe stated she was supportive of family counseling sessions between the children and Raquel. Schwalbe testified that she was not aware that Raquel requested family counseling for the last two years. Schwalbe further testified as to the accuracy of a letter she sent Michael's attorney dated August 4, 2020. That letter contained reports about conversations Michael had with Schwalbe about Raquel. Schwalbe testified that Michael would converse with her before the children's counseling sessions regarding Raquel's actions at the children's schools. Schwalbe testified her letter recommended that Raquel undergo a comprehensive psychiatric and psychological evaluation. Schwalbe also testified that Michael did not report to her that those evaluations had been completed.

¶ 25    Michael called C.K. as a witness, who testified outside of the presence of Michael and Raquel. C.K. testified that he attends Sangamon Valley High School and gets As and Bs in school.

8

He testified that he enjoys attending school and participates in FFA as an officer. He competed in the spelling bees in seventh and eighth grade, placing third and first, respectively. C.K. testified that he walked to the middle school from his daycare provider's house and now takes the bus to the high school. C.K. testified that he attended school from kindergarten through second grade until Raquel pulled the children out to homeschool them. C.K. stated that Raquel never homeschooled them, despite Michael buying curriculum books. C.K. testified he spent time with his siblings instead of being homeschooled.

¶ 26    C.K. was shown Plaintiff's Exhibit 3, and he testified it was a picture of the rods that Raquel used to discipline the children. C.K. testified Raquel disciplined them four days out of the week and struck them five to six times on the rear end or upper thigh. He testified that he never saw R.K. being disciplined but heard it from the next room. C.K. testified he observed Raquel striking J.K. with the rods when J.K. was approximately three years old. C.K. stated he never told Michael about the discipline because he feared what punishment he would receive from Raquel in return. C.K. testified when he was three years old, Raquel tied him to his crib. The court inquired if he could remember when he was three years old, and C.K. stated that he could.

¶ 27    C.K. testified that when he was 9 or 10 Raquel shut herself in her bedroom while he attended to his siblings. C.K. stated it was difficult to navigate through the house because of all the trash and debris. C.K. further testified that for meals, Raquel gave the children cheese and crackers or slices of bread and sometimes frozen meals. He testified that Raquel did not let the children eat the food that Michael brought home.

¶ 28    C.K. testified that he sees Raquel two times a week for two hours each time. They also have 15-minute phone calls that are not court ordered. C.K. testified that Raquel moved into an apartment which has two small bedrooms. He stated Raquel told the children that C.K. and J.K.

9

could sleep in one room in bunk beds, and Raquel and R.K. could sleep in the other room. C.K. testified that he currently goes to church with his mother on Sundays but would like the arrangement to be modified so that he could experience church with Michael.

¶ 29    C.K. testified that recent visits went okay. Raquel asked the children what she can do to change and be a better person. C.K. said they told Raquel they want her to "lighten up" on the interrogating questions and not be so disappointed when the children are unavailable for phone calls. Further, C.K. said Raquel criticized R.K. for her clothing and other actions. C.K. stated he does not want to have overnight visits with Raquel because he does not believe she has improved as a parent.

¶ 30    On cross-examination, C.K. testified that he lived with Michael and had a bedroom that he shares with J.K. He stated that occasionally, J.K. slept on the couch. R.K. has her own bedroom. C.K. stated that Michael shared information with him regarding the divorce and custody proceedings, including what the GAL report said. C.K. testified that Raquel took the children to libraries, a trampoline gym, a roller rink, the county fair, malls, a lake, and numerous restaurants.

¶ 31    C.K. testified that he was interested in improving his relationship with Raquel, but the relationship has not improved. He stated he is content with the two-hour visits, twice a week, as well as the phone calls.

¶ 32    The trial resumed on August 19, 2022. Michael called Raquel to testify. Raquel testified that, prior to her marriage to Michael, she completed some college courses and held minimum wage jobs. Once they married, Raquel was not employed outside the home. After the parties separated, Raquel held part-time and full-time work. She testified she is now employed full-time as a financial relationship specialist at a bank and works part-time on the weekends for Mari-Mann Herbs.

10

¶ 33    Raquel testified that when she and Michael were living together, C.K. and R.K. attended public school. When C.K. was in first, and R.K. in third grade, Michael and Raquel agreed to remove the children from public school to homeschool them. Raquel stated she and Michael made the decision together. Raquel was the principal parent providing the homeschooling. She stated she purchased different kinds of curriculum online. The length of time she spent each day varied from less than one hour to approximately three hours. She stated she did not use the textbooks as often as she should have, and the children did not complete tests or exams. Raquel stated that when the children were not working in home school, she took them on trips to the library, art activities at different churches, the Decatur Arts Council, and the Abraham Lincoln Library Museum. She also enrolled them in a home school group.

¶ 34    Raquel testified to discipline of her children. She used verbal reprimands, time outs, consequences or loss of privileges, and at times, corporal discipline. For corporal punishment she used either her hand or a flexible wooden rod. She stated she did not recall using it on the youngest, J.K., but she did use it on C.K. and R.K. Raquel stated she tied C.K. to a crib with a soft, black-colored scarf when he was four years old.

¶ 35    Raquel testified that she had a problem with active and passive hoarding of books, clothing, household items, and papers when she lived with Michael. She stated they both cleaned the house on occasion, and she did not try to prevent Michael from cleaning the house.

¶ 36    Raquel testified she obtained an emergency order of protection against Michael in 2009. In 2017, Michael and Raquel both filed petitions for orders of protection against one another which were dismissed. Raquel stated she called the police on Michael several times since 2008. She stated he was convicted of domestic battery in Peoria in 2003.

¶ 37    Raquel testified she stopped the children from eating food that Michael brought home due to food safety concerns. Her concerns were that Michael purchased the food several hours before and left it sitting in the car during the summertime. She was also concerned that he smoked cigarettes, took care of dogs, and did not wash his hands. Raquel stated that she provided breakfast, lunch, and dinner for the kids.

¶ 38    Raquel testified that she was indicated for neglect in November of 2019 by DCFS. She stated that she was diagnosed with post-traumatic stress disorder (PTSD) and successfully completed treatment.

¶ 39    Raquel testified that the children attend public school. J.K. attends Sangamon Valley Primary School, R.K. attends Sangamon Valley Middle School, and C.K. attends Sangamon Valley High School. Raquel stated she had no concerns with those schools and had no desire to remove the children. Raquel testified she moved to Illiopolis in 2022 to be in the same school district as the children.

¶ 40    Raquel testified that she works for Regions Bank from 8:30 a.m. to 5:15 p.m., Monday through Friday and one to two Saturdays per month. She stated she also works alternating Saturdays at Mari-Mann Herb Company. However, she is willing to decrease her weekend work hours depending on the parenting arrangements.

¶ 41    Raquel testified that in the fall of 2019, DCFS became involved with the family and the children were placed with Raquel's mother from September 27, 2019, to October 30, 2019. The children then moved to a house in Harristown where Michael lived. Raquel had supervised visitation with the children until the order of protection was vacated on November 27, 2019. Raquel had unsupervised visitation with the children until the end of January 2020. Beginning in February 2020, supervised visits with the children resumed.

12

¶ 42 Raquel's counsel conducted clarification and direct examination. Raquel clarified that she last disciplined C.K. with the rod in 2019 and she last disciplined R.K. with the rod in 2018. She stated she only used the rod one time on J.K. She stated she tied C.K. to the crib to get him to stop pulling his hair out.

¶ 43 Raquel clarified that prior to her relationship with Michael, she did not hoard. She stated she sees a licensed clinical social worker for her mental health. She also stated that in hindsight, the decision to homeschool the children was a mistake. She reiterated that she has no intention of pulling the children out of their current school system. Raquel also stated that she completed everything asked of her by DCFS and the Youth Advocate program.

¶ 44 On direct examination by her counsel, Raquel testified that she met Michael in 2005 when she was an 18-year-old college student; he was 40 years old. Raquel stated she stopped her college education at Michael's request, and they became engaged in 2006. C.K. was born before they were married. They agreed that Raquel would take care of the children and the house.

¶ 45 Raquel testified that she attended every school activity of which she was made aware. She attended parent-teacher conferences, various sporting events, and school plays. She stated she was not able to assist with homework due to her restricted parenting time. She was not able to log onto any of the school portals to inquire how the children were doing or to provide homework support, as she was blocked from the portal. Raquel testified she attempted to enroll the children in the extracurricular activities they were interested in and offered her support through transportation and financial support.

¶ 46 Raquel testified that during her visits with the children, she observed that their hair, toenails, and clothes were frequently dirty. She observed that they often wore the same clothes for several days. Raquel testified that she communicated with Michael by email. She stated that she

13

attempted to inquire with the daycare provider regarding the children, but the daycare provider stopped communicating with Raquel. Raquel testified that she provided meals for the children during their visits.

¶ 47    Raquel testified that she requested at least 50% of parenting time, shared in a week-on/week-off rotational basis, as well as all decision-making responsibilities. She stated that pursuant to the agreed order on temporary parenting time, she had not used corporal punishment, nor had she disparaged Michael or his family. Raquel acknowledged her past failures and wrongdoings as a parent and as person. She expressed a desire to be a better parent and sought reunification and reconciliation with her children.

¶ 48    Raquel called the GAL, Katherine McCarthy, to testify. McCarthy testified that she wrote two GAL reports and recently visited both homes. She testified that she interviewed the children 8 to 10 times over the course of the two and half years prior to trial. In her initial written report, she recommended that Michael receive sole decision-making authority for the children in the areas of medical, education, and extracurricular activities. McCarthy also testified that there was evidence that Michael was withholding educational information and making it difficult for Raquel to be involved in the children's lives or to be informed of education and medical issues.

¶ 49    McCarthy testified that she investigated Michael's complaints about Raquel's interference at school. She spoke to the principals of both schools and discovered there were no reports from teachers of issues with Raquel or interference by Raquel at the schools.

¶ 50    McCarthy's last report was filed April 26, 2022. After that report she conducted a home visit to Michael's home and spoke with the children separately outside the presence of Michael. She also conducted a home visit with Raquel. She testified Raquel's apartment was beautifully

14

furnished and "spic and span clean." McCarthy stated the apartment was reasonable for the children with appropriate sleeping arrangements. She found no evidence of hoarding.

¶ 51    McCarthy presented photographs documenting the condition of Michael's home during her visit. C.K. told McCarthy that he did not have sheets on his bed but was planning on putting new ones on. McCarthy testified there were piles of items "worse than clutter." McCarthy testified she thought she saw animal feces on the floor from R.K.'s pet rabbit. She testified that Michael told her to be careful walking, because wooden boarding was exposed on the floor throughout the home. She stated the floor would give in certain areas due to rotting. Michael told McCarthy he was in the process of remodeling the home, because his mother was preparing it for sale. When McCarthy asked J.K. about the condition of the home, he stated it always looked that way.

¶ 52    In her interviews with the children, McCarthy testified that she did not discover anything alarming regarding their visits with Raquel. McCarthy opined that it was normal for Raquel to inquire into what the children were doing at school, who their friends were, and what clothes they wore.

¶ 53    McCarthy reported that C.K. was a "very angry and bitter" young man. She stated that he did not want to live with his mother. McCarthy opined that if C.K. is forced to visit with Raquel, it would ruin her opportunity to develop a good relationship with the two other children. McCarthy recommended that the visits be separate. She opined that if C.K. does not want to go, it is more harmful to make him go. McCarthy testified that C.K. liked to see his mother, just not very often. McCarthy opined that C.K. had become more bitter overtime because he liked the lifestyle he had with Michael, as Michael gave him more freedom and did not require him to do chores.

¶ 54    McCarthy stated that the children should have family counseling with Raquel and that she recommended family counseling from the beginning of her involvement. She opined that it would

15

be beneficial for Raquel and C.K. to have counseling with one another, apart from the other children. She stated Raquel scheduled family counseling, but Michael refused it.

¶ 55    On cross-examination, McCarthy testified that her first GAL report noted that the children thrived under Michael's care, and that he did a great job acclimating them back into public school. She testified that she did not ask C.K. or R.K. for their opinion on counseling. McCarthy further testified that there was evidence that Raquel did not stay in her apartment. She testified that Raquel stayed with her mother, because it is too lonely at the apartment.

¶ 56    Raquel next called Katelyn Kohtz, Michael's 31-year-old daughter, as a witness. Kohtz testified she lived with Michael for approximately four years, from kindergarten to fourth grade. She testified during the time she lived with Michael, they did not have hot water, but Michael had animals—dogs, lizards, and fish—in and out of the house. She stated Michael had money for the animals but not for groceries. Kohtz stated she wrote to Michael when she was in high school but did not hear back. She stated she had not heard from Michael in 22 years. Kohtz further testified that she discovered her half-siblings, C.K., R.K., and J.K., through her aunt.

¶ 57    Michael was called for direct examination. He testified that he works at HSHS St. Mary's Hospital in Decatur in safety and security for the campus. Michael also serves as the emergency management coordinator. As to the condition of the house during the GAL visit, Michael testified the floors were greatly weakened by moisture. He stated that he purchased new clothes for the children, and they were going through old clothes to donate. Therefore, he stated the rooms were in disarray. Michael stated there was no rabbit feces on the floor, but rather, they were craft beads spilled by R.K.

¶ 58    Michael testified that he cleaned the house following the GAL visit and provided photographs. The photographs showed construction materials and the rooms in the house. He

16

testified that the children did not sleep with other materials on the bed. He further testified that he gives the children chores to complete. Michael testified he paid all the expenses related to education, clothing, medical expenses, and counseling since he and Raquel separated.

¶ 59 Michael introduced photographs depicting the home in 2019, before the parties separated. He testified that there were a lot of new items with tags on them, everything from household goods and supplies to clothing. When he attempted to clean the house, Raquel would block him and threaten to call the sheriff's office.

¶ 60 Michael testified that after the entry of the order of protection which removed Raquel from the home, he enrolled the children in public school. He stated he helped them with their homework and the children received As and Bs. Michael testified that after school, the children have a routine. They do chores, dinner, and homework followed by showers and leisure time. Michael made all educational decisions since the fall of 2019, and he intends to keep the children in their current schools. Michael testified that the children bathe regularly and wear clean clothes each day.

¶ 61 On cross-examination, Michael testified that when Raquel asked for additional parenting time, he allowed the children to decide. Michael stated that he blocked Raquel's access to the education portals. He also testified that he did not inform Raquel whether the children received vaccines or vaccinations for Covid even though Raquel requested that information.

¶ 62 Raquel called Ruth Burns, her mother, as a witness. Burns testified she observed Raquel with the children at church on Sundays during Raquel's parenting time. Burns testified she wants Raquel to have more parenting time so that she can be more involved in their lives.

¶ 63 Raquel next called Joyce VanVleet as a witness. VanVleet testified she is a friend of Raquel. The children and Raquel went to the VanVleets' home once a week for dinner and games. She described Raquel's interaction with the children as very good.

17

¶ 64    Raquel called Rochelle Born, a licensed clinical social worker and coordinator for clinical supervision at Heritage Behavioral Health Center. Born was the outpatient mental health therapist for Raquel for two and a half years from 2019 until April 2022. Born testified that Raquel met criteria for PTSD and was diagnosed with PTSD. She further testified that Raquel experienced various types of abuse which led to her PTSD. In Born's opinion, Raquel's hoarding was a response to her PTSD. In April 2022, Born determined that Raquel had reached therapeutic levels to terminate the therapy.

¶ 65    Raquel's last witness, Sandra Puhlman, was called by evidence deposition due to her unavailability at trial. Puhlman is the director of the foster care licensing and adoptions program at Webster-Cantrell Youth Advocacy and has a master's degree in forensic psychology. Puhlman became involved with the Knights through the intact program at DCFS because of the domestic dispute between the parties and the environmental neglect and schooling. Puhlman testified that Raquel was the alleged perpetrator as she was at home while Michael worked. Puhlman testified she recommended family counseling, but it was not commenced. She further testified that she did not notice any concerns with Raquel supervising the children. Puhlman further opined that Raquel should be included in the decisions for the children's health, schooling, religion, and extracurricular activities. On cross-examination, Puhlman testified that she had no contact with Raquel since August of 2020.

¶ 66    The court entered a written order on October 25, 2022. With regard to the allocation of parental responsibilities, the order read:

> "The children were in a very difficult situation at the onset of this case. They were not in school and living in a horrible environment. After the initial placement Michael has made a home for the children and they are in school and progressing in a normal matter [*sic*] which is an incredible change from where they were. There are allegations about coaching the children and Michael's testimony about some of the things happening in the home led to questions about his credibility on some issues, but the end result is the children have

18

progressed from where they were to leading normal lives and attending school. Michael is awarded decision making, education, medical and extra-curricular activities. No allocation is made as to religion. Michael is awarded the majority of the parenting time. Raquel is awarded parenting time alternating weekends, plus two (2) weeks in the summer. She shall give Michael notice of the weeks she selects to exercise her parenting time on or before March 1 of each year. Hopefully the parties can make arrangements for holidays or else submit Proposed Parenting Plans to the Court to resolve the issue. [C.K.] the oldest child has testified as to the abuse from Raquel and how it has affected his relationship with her. [C.K.] is giving [*sic*] the authority to choose to participate in the weekend visits or summer time and also the amount of the time he spends with Raquel. The children are to continue with counseling."

¶ 67    On November 7, 2022, the court entered a clarifying docket order stating that Raquel's parenting time was to commence at 5 p.m. on Friday to 5 p.m. on Sunday. On November 21, 2022, Raquel filed her notice of appeal. On November 28, 2022, at the hearing on Michael's petition to impound, the court found it did not have jurisdiction based on Raquel's notice of appeal.

¶ 68    On March 13, 2023, appellate counsel for Raquel filed a motion to withdraw appeal with leave to refile. Her motion stated that a written judgment was not entered in the trial court, and the parties were attempting to enter an agreed upon written judgment. On March 15, 2023, this court entered an order holding the appeal in abeyance until the circuit court entered an order disposing of all pending matters.

¶ 69    On May 26, 2023, Raquel filed a petition to cease and desist parental alienation. Also on May 26, 2023, Raquel filed a motion to clarify the order of October 25, 2022. On May 30, 2023, Raquel filed a memorandum in support of her motion to clarify the order of October 25, 2022. In her motion to clarify, Raquel requested (1) that the time for the exchange of the children be modified to 6 p.m.; (2) the location of the exchange take place at the Harristown fire station; (3) that family counseling between Raquel and the children commence *instanter*; (4) that individual counseling for C.K. commence *instanter*; (5) that the date of the marriage be corrected to reflect the parties were married January 18, 2008; (6) that the coverage of vision and dental

insurance for the children be specified; (7) that Michael communicate to Raquel all medical, dental, and vision care, appointments, diagnoses, and treatment plans for the children through the Our Family Wizard application; (8) that the children be allowed to freely and privately electronically communicate with Raquel daily through their own mobile devices with no interference from Michael; (9) that the parties be ordered to communicate solely through the use of the Our Family Wizard application; (10) that Raquel be named as emergency contact for all three children at each of their respective schools; (11) that Raquel be allowed to freely communicate with J.K.'s daycare provider with no negative interference from Michael; (12) that Raquel be allowed to list all marital and nonmarital property at Michael's residence, by way of a walk-through of the residence; (13) that Raquel be allowed to retrieve her marital and nonmarital property at Michael's residence; (14) that the court provide clarification as to all of Raquel's pending motions; and (15) for such other and further relief deemed just by the court.

¶ 70    On July 18, 2023, the trial court entered its judgment of dissolution of marriage. The court's July 18, 2023, judgment for dissolution of marriage stated, in paragraph 10, "[t]hat the parenting time, responsibility and decision making of the parties' three (3) minor children has been decided by this Court." It further ordered:

> "M. Petitioner is awarded medical, educational and extra-curricular activity decision making of the parties' three (3) minor children. No allocation is made as to religious decision making.
> N. Petitioner is awarded majority parenting time of the parties' three (3) minor children. Respondent is awarded parenting time alternating weekends from 6:00 p.m. on Friday to 6:00 p.m. on Sunday. ***
> O. Respondent is awarded two (2) weeks of uninterrupted parenting time in the summer every year. She shall give Petitioner notice of the two (2) weeks she selects to exercise her parenting time on or before the first (1st) of March each and every year. ***
> Q. The parties' oldest child, C.K., is granted the authority to choose whether or not he wishes to participate in the weekend parenting time or summer parenting time with Respondent and the amount of the time thereof."

The July 18, 2023, judgment further ordered Michael to maintain medical insurance for the children and ordered Raquel to contribute to the health insurance coverage for the children.

¶ 71 On July 19, 2023, Michael filed his proposal for holiday parenting time. On August 1, 2023, Raquel filed her proposal for holiday parenting time. The court heard the pending motions on August 2, 2023. The court inquired what issues needed to be clarified. Raquel's counsel raised the issue of the location at which to exchange custody. The court stated the Decatur Conference Center was "a decision I made." Raquel next raised the issue of counseling and argued that the parties are unsure how to proceed with counseling. She next argued the orders do not address vision or dental insurance. The court stated vision and dental insurance is not an issue because "[Michael] indicate[d] he has the children covered with medical and dental insurance already." Raquel next argued that no order was entered regarding electronic communication between Raquel and the children. The court stated, "Right. There was no order entered, so there is nothing to clarify. There was not an order entered. I did not order it."

¶ 72 Raquel next raised the issue of electronic communication between the parties. Counsel argued they asked for some level of clarification regarding the Our Family Wizard application. Michael's counsel argued the application will not improve the quality of communication between the parties. The court concluded, "There is nothing to clarify, right. I didn't order it."

¶ 73 Raquel raised the issue of emergency contacts for schools. The court concluded, "I didn't make any mention of it, so I am not going to include that." With respect to the right of first refusal when the children are by themselves, the court stated, "Right of first refusal is denied. That's why it wasn't mentioned."

¶ 74 Raquel next argued there was no order regarding her communication with the childcare provider. The court inquired if there is anything that prevents Raquel from contacting the daycare

21

provider. Raquel stated there is not, and the court asked, "So doesn't it by implication mean that she can [contact the childcare provider]?" The court concluded that it was not going to order the childcare provider to communicate with Raquel.

¶ 75    Further, relevant to this appeal, Raquel argued that her petition for family counseling that was filed prior to trial was still pending. The court stated, "I think it is clarified. It says the children can continue counseling. If she wants to participate and set up counseling that's—there is nothing that prohibits it ***." Michael's counsel interjected, stating it was their understanding that the language in the order meant the children are to continue going to "counselor Debbie from Pleasant Counseling." Michael was not of the understanding that the children are to engage in family counseling with Raquel. The court clarified the order was intended for the children to "just continue what they are doing."

¶ 76    The following day, the court entered a clarifying docket order regarding holiday parenting time and adopted Michael's proposal with the exception that Michael will have parenting time every Father's Day and Raquel will have parenting time every Mother's Day.

¶ 77    On September 28, 2023, Raquel filed a motion for substitution of judge as a matter of right. A status hearing was held on November 7, 2023. The trial court granted Raquel's motion for substitution of judge and the cause was assigned to Judge Phoebe S. Bowers for further proceedings. On the same day, Raquel filed a petition to allow travel. On December 5, 2023, Michael filed a motion to dismiss the petition to allow travel. Raquel filed a response the same day. After hearing arguments on January 3, 2024, the court granted Michael's motion to dismiss and denied Raquel's petition to allow travel. Raquel filed an amended response to the motion to dismiss petition to allow travel, an offer of proof, and a supplemental offer of proof.

¶ 78    On January 29, 2024, this court entered an order taking the appeal out of abeyance.

22

¶ 79                                    II. ANALYSIS

¶ 80     On appeal, Raquel argues that the trial court abused its discretion when it dismissed her petition to allow travel, and further erred by not ruling on the issues of (1) family counseling by and between the children and Raquel, (2) electronic communication between the children and Raquel, (3) emergency contact with the schools by Raquel, and (4) communication with the daycare providers by Raquel. Further, Raquel argues the court's allocation of decision-making authority and parenting time was against the manifest weight of the evidence. For the reasons that follow, we reverse and remand.

¶ 81     We first address Raquel's argument that the trial erred in its allocation of decision-making responsibilities. Specifically, she argues the trial court erred in its allocation of authority for decisions on health, education, extracurricular, and religious decision-making.

¶ 82     A trial court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2022). In making that decision, the court must consider all relevant factors including:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

23

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id.* § 602.5(c).

¶ 83    An appellate court will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless the decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (citing *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64). " 'A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Id.* (quoting *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51).

24

¶ 84   The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991). "In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25.

¶ 85   In allocating parental responsibilities, the trial court's October 25, 2022, order read:

> "The children were in a very difficult situation at the onset of this case. They were not in school and living in a horrible environment. After the initial placement Michael has made a home for the children and they are in school and progressing in a normal matter [*sic*] which is an incredible change from where they were. There are allegations about coaching the children and Michael's testimony about some of the things happening in the home led to questions about his credibility on some issues, but the end result is the children have progressed from where they were to leading normal lives and attending school. Michael is awarded decision making, education, medical and extra-curricular activities. No allocation is made as to religion."

The trial court did not expressly name the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5(c) (West 2022)). The court's July 18, 2023, judgment of dissolution of marriage ordered the same allocation of parental responsibilities as the October 25, 2022, order.

¶ 86   Michael argues that the trial court considered the testimony presented at trial, the exhibits received, the GAL reports, and the arguments of counsel when making its decision. He argues that decision was in the best interest of the children. Raquel argues that the general statement made by the trial court regarding parental responsibilities is of little help. Further, she argues the evidence at trial indicated that she should be involved in decision-making for the children's health, education, extracurricular, and religion.

¶ 87   Raquel next argues that the trial court erred in its allocation of parenting time. Specifically, she argues the court erred by granting Michael the majority of parenting time.

¶ 88　A trial court must allocate parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2022). The court must consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 89 A reviewing court will not disturb a trial court's allocation of parenting time unless " 'it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion.' " *Jameson*, 2020 IL App (3d) 200048, ¶ 53 (quoting *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21).

¶ 90 In allocating parenting time, the trial court's October 25, 2022, order read:

"Michael is awarded the majority of the parenting time. Raquel is awarded parenting time alternating weekends, plus two (2) weeks in the summer. She shall give Michael notice of the weeks she selects to exercise her parenting time on or before March 1 of each year. *** [C.K.] the oldest child has testified as to the abuse from Raquel and how it has affected his relationship with her. [C.K.] is giving [*sic*] the authority to choose to participate in the weekend visits or summer time and also the amount of the time he spends with Raquel."

The court's July 18, 2023, judgment for dissolution of marriage ordered the same allocation of parenting time as the October 25, 2022, order, with minor modifications to the exchange of custody time.

27

¶ 91    In arguing that the trial court's decision regarding parenting time was against the manifest weight of the evidence, Raquel argues that the evidence at trial supported, at a minimum, equal parenting time. Raquel emphasizes that the GAL reports recommended eventual equal parenting time and that each party have one week of parenting time on a rotating basis. She highlights that the GAL recommended equal access by both parents to school functions and activities and equal sharing of holidays. In response, Michael argues the trial court's allocation of parenting time was not against the manifest weight of the evidence and that the court considered the testimony at trial, the exhibits received, the GAL reports, and the arguments of counsel when making its decision.

¶ 92    The evidence at trial clearly showed that the parties had a toxic relationship and that both Michael and Raquel were responsible for some questionable decision-making. Significantly, much of the testimony presented by one party was contested by the other. Nevertheless, as the GAL recommended, both parents appeared fit to care for the children. This is a significant factor that appears to have been overlooked or short-changed by the trial court.

¶ 93    The trial court's general statement does not establish which statutory factors the court analyzed in reaching its decisions regarding both the allocation of decision-making responsibilities and the allocation of parenting time. While we recognize that there is a strong presumption in favor of the decision reached by the trial court (*Agers*, 2013 IL App (5th) 120375, ¶ 25), and that the court, in rendering its decision, is not required to either make explicit findings on each factor or refer to every factor (*Diehl*, 221 Ill. App. 3d at 424), the court herein failed to offer any explanation as to how it reached its decisions regarding the allotment of decision-making responsibilities and the allotment of parenting time. This is particularly troubling in light of the fact that the evidence in this case is closely balanced.

¶ 94    Insofar as the decision-making responsibilities are concerned, the court focused solely upon the fact that children were enrolled in school and were doing well, while seemingly ignoring the fact that Michael was living in the home when poor decisions were initially made regarding the children's education. In other words, the trial court seems to ignore Michael's culpability in the situation that created the problems in the first place. Perhaps there were good reasons for the trial court's conclusion, but the record does not reflect any rationale for its decision and therefore does not allow for meaningful review of the trial court's decision.

¶ 95    Much of the same can be said of the circuit court's decision regarding the allotment of parenting time: the record does not reflect that the court properly considered the statutory factors. At the same time, the court's grossly disparate split of parenting time seemingly ignores the GAL's report regarding the progress Raquel made in her life, the fact that both parents are fit, and the recommendation of equal parenting time. While the court may have had its reasons for ordering this disparity, those reasons are not readily apparent in the record. Accordingly, we cannot affirm the court's decision in this regard. *Sadler v. Pulliam*, 2022 IL App (5th) 220213 (circuit court's decisions allocating parental responsibilities were against the manifest weight of the evidence where the court failed to mention any factors in sections 602.5(c) and 602.7(b) of the Act (750 ILCS 5/602.5(c), 602.7(b) (West 2020))).

¶ 96    For these reasons, we cannot presume that the court properly considered all statutory factors, where it is unclear from the record what statutory factors, if any, the court analyzed in determining that it was in the children's best interest to award Michael decision-making and the vast majority of parenting time. Accordingly, we conclude the court's decision was against the manifest weight of the evidence, was manifestly unjust, and was the result of an abuse of discretion.

¶ 97    Lastly, we address Raquel's argument that the trial court's dismissal of her petition to allow travel was an abuse of discretion. Specifically, she argues the court erred by finding that it did not have jurisdiction because a notice of appeal had been filed. We agree. Here, the appeal was held in abeyance until the trial court could enter a final judgment and clarifying orders. Therefore, the trial court erred in dismissing Raquel's petition to allow travel.

¶ 98    Based on the foregoing, we reverse the circuit court's order allocating parental responsibilities (decision-making and parenting time) and remand this matter with directions for the court to consider all evidence and statutory factors and to make specific findings outlined in a detailed allocation judgment or parenting plan. Specifically, we instruct the court to address the issues which the court previously declined to order, namely: family counseling; electronic communication between the children and Raquel; emergency contact with the schools by Raquel; and communication with the daycare providers by Raquel. We further instruct the court to conduct the hearing within 45 days of the mandate in this cause, which shall be issued immediately.

¶ 99                    III. CONCLUSION

¶ 100   For the foregoing reasons, we conclude that the Macon County circuit court erred in its allocation of parental responsibilities, specifically decision-making and parenting time, where the court failed to analyze the relevant statutory factors in determining the children's best interests. For the reasons stated herein, we reverse and remand for further proceedings consistent with this order.


¶ 101   Reversed and remanded with directions. Mandate to issue immediately.